## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| HEALTHCARE CO., LTD., a Chinese corporation, <br><br>       Plaintiff, <br><br> v. <br><br> MPI GROUP LLC, a Utah limited liability company; CVB, INC., a Utah benefit corporation; SAM MALOUF, a Utah resident; and SKY BACON TECHNOLOGY HOLDINGS, LLC, a Utah limited liability company, <br><br>       Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [45] DEFENDANTS' MOTION TO DISMISS** <br><br> Case No. 1:25-cv-00031-DBB-CMR <br><br> Judge David Barlow |
| CVB, INC., a Utah benefit corporation; MPI GROUP, LLC, a Utah limited liability company; and SKY BACON TECHNOLOGY HOLDINGS, LLC, a Utah limited liability Company, <br><br>       Counterclaim Plaintiffs, <br><br> v. <br><br> HEALTHCARE CO., LTD., MLILYUSA, Inc., NISCO THAILAND CO., LTD., HEALTHCARE SPAIN, NISCO FURNITURE CO., LTD., HEALTHCARE SC, LLC, HEALTHCARE ARIZONA, LLC, and JAMES NI, a citizen of China, <br><br>       Counterclaim/Third-Party Defendants. | |

Before the court is Counterclaim Defendant Healthcare Co. Ltd's (Healthcare) and Third-Party Defendants Healthcare SC, LLC ("Healthcare SC"), Healthcare Arizona, LLC ("Healthcare AZ"), and MlilyUSA, Inc.'s ("Mlily") (collectively, "Healthcare Companies") Motion to Dismiss[1] CVB, Inc. ("CVB"), MPI Group, LLC ("MPI"), and Sky Bacon Technology Holdings, LLC's ("Sky Bacon") (collectively "Malouf Companies") First Amended Counterclaim and First Amended Third-Party Complaint.[2]

## BACKGROUND

The Counterclaim alleges the following. CVB is a distributor of "luxury bedding" products.[3] MPI and Sky Bacon are affiliates of CVB that have various tenancy and licensing agreements with CVB.[4] James Ni is the CEO of Healthcare.[5] For a decade, the Healthcare Companies manufactured products for the Malouf Companies.[6] They have been CVB's "primary suppliers and manufacturers."[7] In recent years, the organizations' relationship has become strained.[8]

**Allegations Concerning Misrepresentations to CVB's Partners**

Sometime after 2023, Healthcare and James Ni began to use information obtained from former CVB employees to represent to CVB's other partners that CVB was "financially unstable and unable to meet contractual commitments."[9] Healthcare and James Ni made such

---

[1] Motion to Dismiss First Amended Counterclaim and First Amended Third-Party Complaint ("MTD"), ECF No. 45, filed July 3, 2025.
[2] Counterclaim/Third-Party Plaintiffs' First Amended Counterclaim and First Amended Third-Party Complaint ("Counterclaim"), ECF No. 34, filed Apr. 28, 2025.
[3] *Id*. at ¶ 19.
[4] *Id*. at ¶ 108.
[5] *Id*. at ¶ 12.
[6] *Id*. at ¶ 22.
[7] *Id*. at ¶ 84.
[8] *Id*. at ¶ 23.
[9] *Id*. at ¶¶ 65–66.

representations to at least five different CVB suppliers.[10] One supplier, Sleep Country Canada, Inc. (SCC), contacted CVB directly and expressed concerns about its stability, citing Mr. Ni's claims as the source of the concern.[11] In addition, Mr. Ni and Healthcare pressured the suppliers to "reduce or halt shipments to CVB" due to CVB's alleged financial instability.[12] These misrepresentations and pressure tactics caused CVB "operational difficulties and financial harm."[13] CVB alleges that Mr. Ni and Healthcare made these misrepresentations deliberately in an attempt to destabilize CVB and take much of its U.S. market share.[14]

**Allegations Concerning Product Defects and Supply Chain Problems**

In recent years, there has also been "a significant uptick in defective products manufactured by" the Healthcare Companies for CVB.[15] Since 2022, CVB has received over 35,000 complaints related to hundreds of different products manufactured by all the Healthcare Companies.[16] The number of defective products and returns exceeds a "commercially reasonable quantity" that would be expected in "eCommerce business operations."[17] The quality issues with products manufactured by the Healthcare Companies created customer dissatisfaction and negative reviews, which led to retailers reducing or eliminating their orders of CVB products due to quality concerns.[18] Additionally, the Healthcare Companies failed to adhere to delivery schedules with CVB and cancelled or delayed orders, disrupting CVB's supply chain.[19] These

---

[10] *Id.*
[11] *Id.* at ¶ 66.
[12] *Id.*
[13] *Id.* at ¶ 68.
[14] *Id.* at ¶¶ 65, 69.
[15] *Id.* at ¶ 86.
[16] *Id.* at ¶ 87.
[17] *Id.* at ¶¶ 86, 92.
[18] *Id.* at ¶¶ 94–95.
[19] *Id.* at ¶¶ 97–102.

delays and cancellations resulted in product shortages and higher shipping costs.[20] The Manufacturing Companies' defective products and supply chain disruptions were deliberate and were intended to weaken CVB so that Healthcare could usurp its market share or take it over.[21]

**Allegations Concerning Trademark Infringement**

The Manufacturing Companies manufacture products and produce advertisements that have increasingly infringed on CVB and Sky Bacon's trademarks and trade dress in recent years.[22] Specific instances include an MLily mattress that mirrors a Malouf brand mattress in its color scheme, label font, and quilted pattern[23] and a new Healthcare pillow product.[24] The Healthcare pillow, announced in March 2024, is branded as "BodiDough."[25] Sky Bacon owns the registered trademark for "Dough" products and has been selling "Dough" pillows since 2010.[26] Healthcare has manufactured both Malouf brand mattresses and Dough pillows for CVB and Sky Bacon and uses its knowledge of the Malouf Companies' products to produce and market competitive, infringing products.[27] Even after CVB brought suit against other Healthcare affiliates for copying certain CVB marketing materials, Healthcare still distributed infringing products to "Manufacturer Defendants"[28] for continued sale.[29]

---

[20] *Id.* at ¶¶ 99–100.
[21] *Id.* at ¶¶ 103, 199.
[22] *Id.* at ¶ 70.
[23] *Id.* at ¶¶ 72–74 (the Counterclaim includes a description and pictures of the original and allegedly infringing products).
[24] *Id.* at ¶ 79.
[25] *Id.* (the Counterclaim also includes a picture of packaging for the BodiDough pillow).
[26] *Id.* at ¶ 80.
[27] *Id.* at ¶¶ 73, 81–82.
[28] The Counterclaim identifies several defendants that are Healthcare affiliated manufacturing companies as "Manufacturer Defendants" and groups them together for purposes of some allegations and claims. *See* Counterclaim. Healthcare SC and Healthcare AZ are the two "Manufacturing Defendants" that have joined this Motion to Dismiss. MTD 1.
[29] *Id.* at ¶¶ 76–78.

**Allegations Concerning Trade Secrets**

In July 2022, Kyle Robertson, a vice president at CVB who "managed CVB's relationship with Healthcare," left CVB and shortly thereafter joined Mlily as its COO.[30] Since his departure, Mr. Robertson has "recruited or otherwise directly encouraged CVB employees to quit and join Healthcare or Mlily."[31] In February of 2023, another CVB employee, referred to only as "Employee B," was told that he would be fired or laid off the following month due to his insubordinate behavior.[32] Prior to his termination, Employee B stated that he would "be Malouf's biggest enemy" if he were ever fired.[33] CVB agreed to allow Employee B to work until March 10, 2023 to transition his responsibilities.[34] On March 1, Employee B downloaded two documents that CVB considers to be trade secrets and which were protected by various security measures.[35] Employee B regularly used these documents in the course of his employment but had never downloaded them prior to March 1, 2023.[36] The next day, despite his agreement to work until March 10, Employee B abruptly announced that March 3 would be his final day with CVB.[37] Two days later, on March 5, Employee B began working for Mlily.[38] CVB alleges that Employee B provided the trade secrets he downloaded to Healthcare and Mlily, who subsequently used the information to undercut CVB's pricing and target CVB's customers.[39]

---

[30] *Id.* at ¶¶ 24–25, 29.
[31] *Id.* at ¶ 32.
[32] *Id.* at ¶¶ 39–42.
[33] *Id.* at ¶ 41.
[34] *Id.* at ¶ 42.
[35] *Id.* at ¶¶ 33–38, 44.
[36] *Id.* at ¶ 45.
[37] *Id.* at ¶ 47.
[38] *Id.* at ¶ 49.
[39] *Id.* at ¶¶ 57–58.

**Allegations Concerning the Warehouse Agreement**

Sometime in early 2024, MPI and Healthcare negotiated an agreement that was intended to satisfy MPI's debt obligations to Healthcare.[40] The parties negotiated for a "five-year, reduced price lease for a MPI owned warehouse in Ohio."[41] Healthcare would pay reduced rent and have an option to purchase the warehouse at the end of the lease term.[42] Sometime before April 2024, James Ni affirmatively represented that "the deal was done" and that MPI should "clear out the warehouse."[43] In reliance on these statements, MPI spent around $1,000,000 clearing out the warehouse.[44] Later, in April 2024, Mr. Ni added new demands to the deal and ultimately refused to execute the warehouse lease agreement.[45] MPI alleges several million dollars of damages resulting from the expenses of clearing and preparing the warehouse and from MPI's inability to rent the warehouse to another party.[46]

**Allegations Concerning the Licensing Agreement, Side Letter, and Second Note Extension**

In the summer of 2024, the Malouf Companies began negotiating three different agreements with Healthcare: (1) a "Second Note Extension" that would extend the maturity date of MPI's existing debt until August 2025,[47] (2) a "License Agreement" that would give HCMC, a Healthcare-created entity, licensing rights to Sky Bacon's "Lucid" brand products,[48] and (3) a "Side Letter" that would apply a portion of Healthcare's profits from the Lucid deal against the

---

[40] *Id*. at ¶¶ 112–14.
[41] *Id*. at ¶ 116.
[42] *Id*. at ¶ 117.
[43] *Id*. at ¶ 119.
[44] *Id*. at ¶ 119.
[45] *Id*. at ¶ 121.
[46] *Id*. at ¶¶ 123–24.
[47] *Id*. at ¶ 131.
[48] *Id*. at ¶¶ 128–29.

"outstanding balance of the MPI note.[49] The parties negotiated in Las Vegas on July 28, 2024.[50] Mr. Ni said during the course of the meeting, "the deal is moving forward and the attorneys can figure out the details," and instructed his attorneys to stop talking because the deal was done.[51] On August 2, 2024, counsel for the Malouf Companies sent Healthcare's counsel final redlines of the three agreements and asked if there were any concerns.[52] Healthcare's counsel responded "[t]he redlines okay to us."[53] Healthcare sent an executed copy of the License Agreement on August 5 and indicated the other agreements would soon be executed as well.[54] Healthcare subsequently signed a revised version of the License Agreement on August 8.[55]

Immediately after the negotiations, Healthcare asked to accompany CVB on a preplanned trip to meet with some of CVB's other business partners.[56] CVB agreed in light of the companies' "new partnership."[57] Following those meetings, the Malouf Companies and Healthcare and Mlily met to discuss the specifics of the partnership.[58] During these meetings and the preplanned meetings with CVB's other partners, Healthcare and Mlily had access to large amounts of confidential information about the Malouf Companies' business operations.[59] After several days of meetings, Healthcare's delegation abruptly disappeared on August 16.[60] When CVB contacted James Ni, Mr. Ni informed the Malouf Companies that there would be no deal,

---

[49] *Id.* at ¶ 130.
[50] *Id.* at ¶ 126.
[51] *Id.* at ¶ 127.
[52] *Id.* at ¶ 134.
[53] *Id.* at ¶ 135.
[54] *Id.* at ¶ 136.
[55] *Id.* at ¶ 137.
[56] *Id.* at ¶ 139.
[57] *Id.*
[58] *Id.* at ¶¶ 142–43.
[59] *Id.* at ¶¶ 140–45.
[60] *Id.* at ¶ 146.

Healthcare would not sign the agreements, and that Healthcare was repudiating the License Agreement.[61] During the course of formal negotiations, Mr. Ni had also been negotiating privately with Sam Malouf in an attempt to convince Mr. Malouf to assign MPI's debt obligations to CVB.[62] Malouf Companies allege that Mr. Ni refused to continue with the agreements and negotiations because Mr. Malouf declined to reassign MPI's debt obligations.[63]

During the course of negotiations, Healthcare discouraged CVB from ordering Lucid brand products from other suppliers, representing that Healthcare would fulfill all Lucid orders.[64] Based on Healthcare's representations, CVB did not place any Lucid orders with other suppliers.[65] When Healthcare repudiated the Licensing Agreement, it refused to fulfill any Lucid orders for CVB and communicated with other suppliers to tell them to refuse to serve CVB as well.[66] As a result, CVB was left without stock to fulfill orders for many of its products and suffered large financial damages.[67]

## STANDARD

"Dismissal under Rule 12(b)(6) is appropriate only if the complaint, viewed in the light most favorable to plaintiff, lacks enough facts to state a claim to relief that is plausible on its face."[68]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[69]

---

[61] *Id*. at ¶¶ 148–50.
[62] *Id*. at ¶¶ 152–53.
[63] *Id*. at ¶ 154.
[64] *Id*. at ¶ 156.
[65] *Id*. at ¶ 157.
[66] *Id*. at ¶¶ 158–60.
[67] *Id*. at ¶¶ 161–63.
[68] *Abdi v. Wray*, 942 F.3d 1019, 1025 (10th Cir. 2019) (citing *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764 (10th Cir. 2019)).
[69] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

"In evaluating a motion to dismiss, the court must take as true all well-pleaded facts, as distinguished from conclusory allegations, view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings."[70] Conclusory statements and legal conclusions are "not entitled to the assumption of truth."[71]

Generally, "a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings."[72] "However, notwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, 'the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"[73] Courts may also consider "documents that the complaint incorporates by reference,"[74] "documents attached as exhibits to the complaint,"[75] and "matters of which a court may take judicial notice,"[76] including "facts which are a matter of public record."[77]

---

[70] *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1130–31 (10th Cir. 2024) (quoting *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021)) (also quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002)) (cleaned up).
[71] *Iqbal*, 556 U.S. at 1951 (emphasis omitted).
[72] *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *Prager v. LaFaver*, 180 F.3d 1185, 1188 (10th Cir. 1999)).
[73] *Id.* (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).
[74] *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).
[75] *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001).
[76] *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).
[77] *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006).

## DISCUSSION

**I.    Sky Bacon Contract Claims (Counts 1 and 7)**

The Healthcare Companies first argue that Sky Bacon's claims for breach of the implied covenant of good faith and fair dealing (Count 1) and breach of contract (Count 7) should be dismissed.[78] Sky Bacon asserts these claims against Healthcare based on Healthcare's alleged breach of its duties under the License Agreement.[79] Healthcare responds that the Counterclaim does not allege facts supporting these claims because the agreement was between Sky Bacon and HCMC, not Healthcare, and because there was no meeting of the minds.[80]

As an initial matter, the parties seem to disagree about what law governs these issues. Healthcare generally cites Utah law to support its contentions regarding the implied covenant of good faith and fair dealing.[81] Sky Bacon uses California law.[82] This court, sitting in diversity, applies Utah choice of law rules to determine which law applies to the contractual claims.[83] In Utah, contractual choice of law provisions are enforceable.[84] In the absence of a valid choice of law provision, Utah courts apply the "most significant relationship" test to determine which state's law governs a contract dispute.[85] This test relies on several factors but generally boils down to "one basic policy, namely protection of the expectations of the parties."[86] Here, the

---

[78] MTD 8.

[79] Counterclaim ¶¶ 169–75, 218–22.

[80] MTD 9–10.

[81] MTD 10; Healthcare Co. Ltd's Reply in Support of its Motion to Dismiss ("Reply to Sky Bacon") 2 n.2, ECF No. 61, filed Aug. 28, 2025.

[82] Counterclaim Plaintiff Sky Bacon Technology Holdings LLC's Response to Counterclaim /Third-Party Defendants' Motion to Dismiss ("Sky Bacon Opp'n") 10 n.5, 12 n.6, ECF No. 58, filed Aug. 7, 2025.

[83] *ClearOne, Inc. v. PathPartner Tech., Inc.*, No. 2:18-CV-427-JNP-PMW, 2019 WL 12043493, at *3 (D. Utah Sept. 30, 2019).

[84] *Id.*

[85] *Am. Nat. Fire Ins. Co. v. Farmers Ins. Exch.*, 927 P.2d 186, 190 (Utah 1996).

[86] *Id.* (quoting Eugene Scoles & Peter Hay, *Conflict of Law* § 18.1, at 632 (1984)).

License Agreement has a choice of law provision that selects California law to govern the agreement.[87] However, the parties disagree about the validity of the contract, including its choice of law provision.[88] The License Agreement is between a California entity and a Utah entity, was negotiated in Nevada,[89] and has no set location for performance.[90] It is not immediately clear which state has the "most significant relationship" to govern construction of the agreement's enforceability if the choice of law provision is not valid. But because the parties agreed to have California law govern any contract that did exist, and because one party is incorporated in California, it seems that the parties' expectations would best be protected by applying California law.

### A.  Meeting of the Minds

Healthcare first contends that the Counterclaim does not allege any facts beyond conclusory allegations to show that there was a meeting of the minds on the licensing agreement.[91] A meeting of the minds requires mutual consent on the "subject matter and the terms and conditions" of an agreement.[92] Failure to agree about "all material points" prevents the formation of a contract even if the parties agree on some terms.[93] In the Counterclaim, Sky Bacon alleges that Healthcare sent the Malouf Companies a fully executed version of the License Agreement on August 5, 2024.[94] Healthcare responds by pointing out that a revised version was

---

[87] License Agreement, ECF No. 45-1, filed July 3, 2025 (Because the License Agreement is referenced in the Counterclaim and is central to several of the Malouf Companies' claims, the court will consider it for this Motion.).
[88] *See* MTD 10.
[89] Counterclaim ¶ 126.
[90] *See generally* License Agreement.
[91] MTD 10.
[92] *Blake v. Mosher*, 11 Cal. App. 2d 532, 536, 54 P.2d 492 (1936).
[93] *Banner Ent., Inc. v. Superior Ct. (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 350, 72 Cal. Rptr. 2d 598 (1998), as modified (Mar. 30, 1998).
[94] Counterclaim ¶ 136.

subsequently circulated but not countersigned.[95] The record is silent about why a second License Agreement was circulated and its intended effect on the first agreement. However, factual allegations of a fully signed and executed, detailed first License Agreement between two sophisticated parties after extended negotiations involving counsel are sufficient to plausibly show that there was a meeting of the minds on all material terms of the License Agreement.

### B. Alter Ego Liability

Healthcare next argues that the Counterclaim only alleges that the License Agreement was between Sky Bacon and HCMC, a non-party to this suit.[96] The Counterclaim states upon information and belief that HCMC is an alter ego of Healthcare, is a shell corporation, and should be treated as an extension of Healthcare for legal purposes.[97] Healthcare responds that such allegations are conclusory and factually unsupported.[98] In the absence of factual allegations to support finding "alter ego status," mere conclusory allegations are insufficient to withstand a motion to dismiss.[99] In California,[100] "[t]wo elements must be alleged in order to invoke the [alter ego] doctrine: 'First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in

---

[95] MTD 10.

[96] MTD 9.

[97] Counterclaim ¶ 128 n.3.

[98] MTD 9.

[99] *United States v. Van Diviner*, 822 F.2d 960, 964 (10th Cir. 1987).

[100] Utah courts "appl[y] the law of the state of incorporation" in an alter ego analysis. *Knight Bro., LLC v. Barer Eng'g Co. of Am.*, No. 2:10-CV-108 TS, 2011 WL 237153, at *5 (D. Utah Jan. 24, 2011); *see also d'Elia v. Rice Dev., Inc.*, 2006 UT App 416, ¶ 27, 147 P.3d 515, 521, holding modified by Jones & Trevor Mktg., Inc. v. Lowry, 2012 UT 39, ¶ 27, 284 P.3d 630 ("We begin by noting that because Rice Inc. is a California corporation and Rice LLC is a Utah company, we apply California and Utah law, respectively.").

question are treated as those of the corporation alone.'"[101] A complaint must "allege specific facts to support both elements of alter ego liability."[102] Many factors exist that courts can consider in deciding whether unity of interest and inequitable results exist.[103] Sky Bacon points the court to three factors that it claims are factually supported by the Counterclaim: (1) "the use of a corporation as a mere shell, instrumentality or conduit for a single venture," (2) "comingling of funds and other assets,"[104] and (3) "the use of the same employees and attorney[s] by both companies."[105]

Although the Counterclaim's principal allegation of alter ego liability is a conclusory statement,[106] the Counterclaim also includes a sufficient factual basis to plausibly support a finding of alter ego liability based on the factors mentioned above.[107] It alleges that the Malouf Companies' License Agreement with HCMC was reached after lengthy negotiations with Healthcare and Healthcare executives,[108] that Healthcare executives and attorneys negotiated and signed on behalf of HCMC,[109] and that HCMC's License Agreement with Sky Bacon would channel profits towards paying off a debt to Healthcare.[110] These facts plausibly support that Healthcare and HCMC had sufficient "unity of interest."

---

[101] *Burns v. WeCall Media, Inc.*, No. 2:22-CV-00585-AB-PD, 2022 WL 3012520, at *4 (C.D. Cal. May 27, 2022) (quoting *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 526, 99 Cal.Rptr.2d 824 (2000)).
[102] *Id*.
[103] *Id*.
[104] *Id*.
[105] *Elliott v. Occidental Life Ins. Co*. of Cal., 272 Cal. App. 2d 373, 377, 77 Cal. Rptr. 453, 455 (Ct. App. 1969); *see* Sky Bacon Opp'n 10.
[106] Counterclaim ¶ 128 n.3.
[107] *See Burns*, 2022 WL 3012520, at *5 (The complaint's "conclusory recitation" of the elements for alter ego was sufficient because it was "later supported by facts").
[108] Counterclaim ¶¶ 125–29.
[109] *Id*. at ¶¶ 126, 136.
[110] *Id*. at ¶¶ 128, 130.

Additionally, the Counterclaim alleges that Healthcare used HCMC's License Agreement with Sky Bacon to induce the Malouf Companies to share confidential information and trade secrets before suddenly repudiating the agreement.[111] "[F]raud allegations" and other bad faith actions, like using a corporate alter ego to induce the disclosure of confidential business information "are exactly the type of actions which would make it inequitable for the corporate owner to hide behind the corporate form."[112] The Counterclaim contains sufficient factual allegations to plausibly support a finding of corporate unity and inequitable results.

### C. Covenant of Good Faith and Fair Dealing

Finally, Healthcare denies that Sky Bacon can assert any claim for breach of the implied covenant of good faith and fair dealing because the Counterclaim lacks allegations that HCMC's "exercise of discretion" harmed Sky Bacon.[113] In California, the covenant of good faith and fair dealing is "implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract."[114] Notably, "the covenant looks beyond the express terms of the contract," focusing instead on the parties' implied expectations.[115] Therefore, "where breach of an actual term is alleged, a separate implied covenant claim, based on the same breach, is superfluous."[116]

---

[111] *Id.* at ¶¶ 138–40, 203, 206–08.

[112] *Burns*, 2022 WL 3012520, at *8.

[113] MTD 10. The "exercise of discretion" language comes from a Utah case. *See Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 20, 84 P.3d 1154, 1159. But Healthcare has not shown that Utah law governs the contract.

[114] *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1140, 271 Cal. Rptr. 246 (Ct. App. 1990).

[115] *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 112 Cal. App. 5th 519, 558, 334 Cal. Rptr. 3d 488, 523 (2025), review denied (Sept. 17, 2025).

[116] *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 327, 8 P.3d 1089, 1095 (2000); *see also Smith v. Int'l Bhd. of Elec. Workers*, 109 Cal. App. 4th 1637, 1644 n.3, 1 Cal. Rptr. 3d 374, 378 n.3 (2003) ("A breach of the covenant of good faith and fair dealing does not give rise to a cause of action separate from a cause of action for breach of the contract containing the covenant."); *Storek & Storek, Inc. v. Citicorp Real Est., Inc.*, 100 Cal. App. 4th 44, 63–64, 122 Cal.

Here, the Counterclaim alleges that HCMC was required to use its "best efforts" to promote and sell the licensed products directly to consumers and fulfill its contractual obligations.[117] Sky Bacon expected a benefit that would include "a 7% royalty fee on gross sales" of the licensed products.[118] The Counterclaim then states that Healthcare repudiated the License Agreement on behalf of HCMC and that Sky Bacon was unable to obtain a similarly beneficial licensing agreement for the Lucid brand products.[119] However, these facts relate to Healthcare's alleged breach of express terms in the contract rather than to a breach of the parties' implied expectations. The claim for breach of the implied covenant of good faith and fair dealing is superfluous on these facts because it is based on alleged breaches of express contractual terms.[120]

## II.    Misappropriation of Trade Secrets (Counts 2 and 3)

The Counterclaim alleges misappropriation of trade secrets against Healthcare and Mlily under both the Defend Trade Secrets Act and the Uniform Trade Secrets Act.[121]

### A.    Defend Trade Secrets Act (Count 2)

To establish a claim for misappropriation of trade secrets under the Defend Trade Secrets Act (DTSA), a plaintiff must plead facts showing:

> (1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person

---

Rptr. 2d 267, 283–84 (2002) ("[P]laintiffs' assertions pertain to a claim of breach of the express terms of the contract, not a breach of the implied covenant of good faith and fair dealing.").

[117] Counterclaim ¶¶ 128, 172; License Agreement 5, 21.

[118] Counterclaim ¶ 129; License Agreement 22.

[119] *Id*. at ¶¶ 150, 155.

[120] *See Guz*, 8 P.3d at 1095.

[121] Counterclaim ¶¶ 176–95.

acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means.[122]

Healthcare maintains that, though the Counterclaim lists facts relating to Employee B's relationship with CVB and the trade secrets, it does not plausibly connect Employee B's actions to the Healthcare companies.[123] Both parties rely heavily on caselaw to support their arguments.

Healthcare cites to *CGB Diversified Servs., Inc. v. Adams,* where a plaintiff failed to state a claim under the DTSA when the complaint only alleged that (1) an employee had access to trade secrets as part of his employment, (2) he accessed those secrets while a memory device was connected to the computer, (3) he accessed a "wide variety and unusually large number" of confidential documents in the weeks prior to his resignation, and (4) shortly thereafter, he went to work for a competitor.[124] The court in CGB noted that the complaint only alleged that the employee accessed rather than transferred the sensitive files but stated that "even if [the plaintiff] alleged transferring, possessing files is not enough to state a claim of misappropriation."[125]

In contrast, CVB cites to *Vendr, Inc. v. Tropic Techs., Inc*., where a plaintiff successfully stated a claim for misappropriation when its complaint alleged that (1) a former employee downloaded significant amounts of confidential information "in the last weeks of his employment," (2) the employee reset his laptop prior to returning it contrary to company policy, (3) the employee joined the defendant company, a competitor, seven days after leaving his former employer, (4) the employee's new position was "comparable" to his previous one and had

---

[122] *Complete Merch. Sols., LLC v. Davis*, No. 2:24-CV-00789-RJS-DAO, 2024 WL 5057687, at *3 (D. Utah Dec. 10, 2024); 18 U.S.C. § 1836.
[123] MTD 11-12.
[124] *CGB Diversified Servs., Inc. v. Adams*, No. 2:20-CV-2061-HLT-KGG, 2020 WL 1847733, at *1-2 (D. Kan. Apr. 13, 2020).
[125] *Id*. at *3.

"substantial overlap" of duties and responsibilities, (5) the defendant company was engaged in a "concerted campaign to recruit [plaintiff's] employees" despite being aware of their non-compete agreements, and (6) the defendant refused to fire the employee or take satisfactory measures to prevent the use of trade secrets after the plaintiff raised concerns.[126] The court determined that the complaint alleged "circumstances that could give rise to an inference that [defendant] could have had reason to know of [the employee's] alleged misconduct but noted the allegations were "as close to bare bones" as they could be to survive a motion to dismiss.[127]

In this case, CVB alleges that Employee B made hostile remarks about the Malouf Companies,[128] downloaded trade secrets in an unusual manner,[129] unexpectedly left his employment contrary to his previous commitments, and joined Mlily—a direct competitor— two days later.[130] CVB further alleges "upon information and belief" that Healthcare bargained with Employee B to exchange the secrets for employment,[131] Employee B provided the trade secrets to the Healthcare Companies,[132] and the Healthcare Companies misappropriated and used the trade secrets to undercut CBV pricing and target CVB customers.[133] In the Tenth Circuit, "the mere fact that a plaintiff uses the language 'information and belief' does not make an allegation conclusory."[134] Instead, the court must consider the content of the allegations and whether "the

---

[126] *Vendr, Inc. v. Tropic Techs., Inc*., No. 2:23-CV-165-DAK-DAO, 2023 WL 8789297, at *1-3 (D. Utah Dec. 19, 2023).
[127] *Id*. at *5.
[128] Counterclaim ¶ 41.
[129] *Id.* at ¶¶ 44–46.
[130] *Id.* at ¶¶ 47–49.
[131] *Id.* at ¶¶ 1(b), 59.
[132] *Id.* at ¶¶ 57, 182.
[133] *Id.* at ¶¶ 58, 60.
[134] *Aaag-California, LLC v. Kisana*, No. 220CV00026HCNJCB, 2020 WL 2849929, at *2 (D. Utah June 2, 2020) (quoting *McCartney v. United States*, 31 F. Supp. 3d 1340, 1345 (D. Utah 2014)).

belief is based on factual information that makes the inference of culpability plausible" or whether "the facts are peculiarly within the possession and control of the defendant."[135]

This case presents a close call. However, based on the record here, the Counterclaim alleges enough facts to plausibly support a claim for misappropriation of trade secrets under the DTSA at this stage. The Counterclaim does more than simply allege that Employee B left his job to work for a competitor.[136] It claims that the employee indicated a desire to harm his former employer, downloaded trade secrets that he had never downloaded before, and then unexpectedly left CVB immediately after downloading the secrets to begin working at a direct competitor two days later.[137] These facts, especially in light of the apparent animosity between the parties and the Healthcare Companies' singular control of relevant information, provide sufficient basis to accept CVB's "information and belief" pleadings at this stage. The Counterclaim plausibly alleges misappropriation of trade secrets, and "the parties can explore [additional] details in discovery."[138]

Count 2 in the Counterclaim also bases a DTSA claim on trade secrets that the Healthcare Companies allegedly fraudulently induced the Malouf Companies to disclose based on promised partnership agreements.[139] The Healthcare Companies do not challenge the misappropriation claim on these grounds.

---

[135] *Id.* (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *see also U.S. ex rel. Schwartz v. Coastal Healthcare Grp., Inc.*, 232 F.3d 902 (10th Cir. 2000); *Wireless Advance Vehicle Electrification, LLC v. WiTricity Corp.*, No. 2:24-CV-00577-RJS-CMR, 2025 WL 895322, at *7 (D. Utah Mar. 24, 2025).

[136] *See CGB Diversified Servs., Inc. v. Adams*, No. 2:20-CV-2061-HLT-KGG, 2020 WL 1847733, at *3 (D. Kan. Apr. 13, 2020) ("Simply taking a new job with a competitor does not plausibly suggest misappropriation.").

[137] Counterclaim ¶¶ 41–49.

[138] *Vendr, Inc. v. Tropic Techs., Inc.,* No. 2:23-CV-165-DAK-DAO, 2023 WL 8789297, at *5 (D. Utah Dec. 19, 2023)

[139] Counterclaim ¶¶ 144, 164–66, 183; CVB/MPI Opp'n 8.

### B.    Uniform Trade Secrets Act (Count 3)

To establish a claim under the Utah Uniform Trade Secrets Act (UTSA), a plaintiff must "demonstrate (1) the existence of a trade secret, (2) communication of the trade secret to the defendant under an express or implied agreement limiting disclosure of the secret, and (3) the defendant's use of the secret that injures the plaintiff."[140] As discussed above, the Counterclaim pleads sufficient facts to plausibly allege that the Healthcare Companies misappropriated and used the information downloaded by Employee B. Therefore, the Counterclaim plausibly alleges misappropriation of trade secrets under both the UTSA and the DTSA. Count 3 also bases the UTSA claim on the confidential information allegedly fraudulently acquired at the August meetings, which Healthcare has not challenged.[141]

### III.    Tortious Interference (Count 4)

CVB and Sky Bacon assert a tortious interference claim against Healthcare and the Manufacturer Defendants.[142] Under Utah law, a tortious interference claim requires a plaintiff to show "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff."[143] The Malouf Companies' tortious interference claim is based on the Healthcare Companies' alleged misrepresentations about CVB to its partners and the intentional provision of defective and delayed products to CVB.[144] Healthcare argues that this claim fails because the allegations of

---

[140] *Complete Merch. Sols., LLC v. Davis*, No. 2:24-CV-00789-RJS-DAO, 2024 WL 5057687, at *3 (D. Utah Dec. 10, 2024) (cleaned up); Utah Code Ann. § 13-24-2.
[141] Counterclaim ¶¶ 193–94.
[142] *Id.* at ¶¶ 196–201.
[143] *Davidson v. Baird*, 2019 UT App 8, ¶ 55, 438 P.3d 928, 945 (quoting *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553).
[144] Counterclaim ¶¶ 197–99.

disparaging statements and defective shipments do not qualify as improper means.[145] "Improper means include violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood."[146] Means may also be improper if they "violate an established standard of a trade or profession."[147] The existence of an established industry standard may be shown by expert testimony, uniform codes, or "industry-specific regulations."[148]

First, Healthcare argues that the alleged misrepresentations attributed to it cannot be improper means because they are true.[149] The Counterclaim states that Healthcare told CVB's partners that CVB was "financially unstable and unable to meet its contractual commitments."[150] Healthcare points to the Malouf Companies' admission that "CVB struggled to satisfy its debt obligations to Healthcare"[151] as evidence that the assertions about CVB's stability were true.[152] On a motion to dismiss, the court must make all reasonable inferences in favor of the nonmoving party.[153] Viewing the Counterclaim's allegations most favorably to CVB, it is not necessarily true that CVB's unpaid debt obligations to Healthcare indicate that CVB was financially unstable or unable to more broadly "meet its contractual commitments." The Counterclaim alleges facts that plausibly show that Healthcare engaged in deceit or misrepresentation, which qualifies as improper means.[154]

---

[145] MTD 13.

[146] *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858, 864.

[147] *Id.*

[148] *England Logistics, Inc. v. Kelle's Transp. Serv., LLC*, 2024 UT App 137, ¶ 52, 559 P.3d 45, 59, reh'g denied (Nov. 5, 2024) (quoting *C.R. England v. Swift Transportation Co.*, 2019 UT 8, ¶ 48, 437 P.3d 343, 355).

[149] MTD 6; Reply to Sky Bacon 5.

[150] Counterclaim ¶ 65.

[151] *Id.* at ¶ 105.

[152] MTD 6.

[153] *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1130–31 (10th Cir. 2024).

[154] *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858, 864.

Second, Healthcare challenges CVB's argument that defective products and shipping delays violate an industry standard.[155] The Counterclaim pleads facts supporting its claim that the Healthcare Companies intentionally supplied defective products and delayed shipments to CVB.[156] The Malouf Companies argue that such behavior is evidence that Healthcare improperly violated an established industry standard.[157] Healthcare responds that the Counterclaim fails to provide expert evidentiary support for such a standard and notes that Utah law requires parties to establish industry requirements by expert testimony or similar means.[158] Notably, the cases that establish this requirement do so in the context of post-trial review[159] or motions for summary judgment.[160] To ultimately prevail on their tortious interference claim on these grounds, the Malouf Companies will have to present such evidence. However, the sufficiency of such evidence is not at issue on a motion to dismiss. At this stage, it is sufficient that the Counterclaim states facts that could plausibly support intentional violations of an established industry standard.

Third, Healthcare contends that the claim for tortious interference does not state improper means and is barred by the economic loss rule to the extent the defective products and shipping delays violated contractual duties between the parties.[161] Tortious interference cannot be based on one party to a contract "inducing a breach by himself or the other contracting party."[162]

---

[155] Reply to CVB and MPI in Support of Mot. to Dismiss ("Reply to CVB/MPI") 5, ECF No. 62, filed Aug. 28, 2025.

[156] Counterclaim ¶¶ 84–103, 199.

[157] CVB and MPI's Response to Counterclaim/Third-Party Defendants' Motion to Dismiss ("CVB/MPI Opp'n"), ECF No. 57, filed July 31, 2025.

[158] *C.R. England v. Swift Transportation Co.*, 2019 UT 8, ¶ 46, 437 P.3d 343, 354–55.

[159] *England Logistics, Inc. v. Kelle's Transp. Serv., LLC*, 2024 UT App 137, ¶ 52, 559 P.3d 45, 59, reh'g denied (Nov. 5, 2024).

[160] *C.R. England*, 437 P.3d at 355.

[161] MTD 14.

[162] *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 301 (Utah 1982), overruled on other grounds by *Eldridge v. Johndrow*, 2015 UT 21, 345 P.3d 553.

Similarly, the economic loss rule requires that, "when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort."[163] Here, Healthcare's argument relies on the Counterclaim's reference to "an agreed upon schedule" for supplying products.[164] This single reference does not allege a contract related to delivery or include any contractual terms that could be used to establish duties and breach. No contracts related to product defects or supply are raised in the Counterclaim. In the absence of any contracts or contractual duties, Healthcare's argument is unpersuasive.

Finally, Healthcare asserts that, regardless of whether CVB has properly pled tortious interference, Sky Bacon cannot do so because the facts only relate to the Healthcare Companies' interactions with CVB.[165] The Counterclaim states that Healthcare's allegedly improper actions toward CVB caused a "diminution in the value of the intellectual property owned by Sky Bacon."[166] The Counterclaim supports this assertion by stating facts that show Sky Bacon owns trademarks and licenses them for CVB's use[167] and that CVB has incurred steep losses due to Healthcare's actions.[168] Taken in the light most favorable to Sky Bacon, these facts plausibly support Sky Bacon's claim that the Healthcare Companies' allegedly improper tortious interference with CVB also directly harmed Sky Bacon by lowering the value of the intellectual property it had licensed to CVB.

---

[163] *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc*., 2018 UT 61, ¶ 12, 435 P.3d 193, 196 (quoting *Reighard v. Yates*, 2012 UT 45, ¶ 20, 285 P.3d 1168).
[164] MTD 14; Counterclaim ¶ 85.
[165] Reply to Sky Bacon 5.
[166] Counterclaim ¶ 200.
[167] *Id*.at ¶¶ 80–81, 128, 157.
[168] *Id*. at ¶ 96.

## IV.    Fraudulent Misrepresentation (Counts 5 and 6)

The Malouf Companies claim that the Healthcare Companies made fraudulent representations about two separate deals: (1) the partnership agreement with CVB and Sky Bacon—encompassing the License Agreement, Side Letter, and Second Note Extension—and (2) the warehouse agreement with MPI.[169] To show fraudulent misrepresentation, a plaintiff must allege:

> (1) that a representation was made (2) concerning a presently existing material fact which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.[170]

Unlike most claims, allegations of fraud must be pled with particularity,[171] including facts showing the "time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[172]

### A.    License Agreement Misrepresentations (Count 5)

CVB and Sky Bacon allege that during the parties' negotiations surrounding the License Agreement, Second Note Extension, and Side Letter, Mr. Ni represented that "the deal was done" and said, "the deal is moving forward and the attorneys can figure out the details."[173] After the negotiations, the parties circulated redline drafts of the contracts, and Healthcare's counsel "indicated that Healthcare would be shortly sending executed versions of the Side Letter and

---

[169] Counterclaim ¶¶ 202–17.
[170] *Fid. Nat. Title Ins. Co. v. Worthington*, 2015 UT App 19, ¶ 10, 344 P.3d 156, 159.
[171] Fed. R. Civ. P. 9(b).
[172] *Schwartz v. Celestial Seasonings, Inc*., 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir.1991)).
[173] Counterclaim ¶ 127.

Second Note Extension."[174] The Counterclaim alleges that these representations were false and induced CVB and Sky Bacon to reveal confidential information.[175] Healthcare responds that the Counterclaim cannot state a claim for fraud because the representations relate to a future occurrence rather than a presently existing fact, damages are not pled with particularity, and the economic loss rule bars any fraud claims.[176]

### 1.    Economic Loss Rule

The economic loss rule bars duplicative tort claims that arise "when the alleged fraud 'is also a breach of warranty in the contract.'"[177] Healthcare characterizes CVB and Sky Bacon's fraud claim as arising from the same duties set forth in the purported licensing agreement between Sky Bacon and HCMC.[178] "To determine whether the economic loss rule bars a claim, the court must consider 'whether a duty exists independent of any contractual obligations between the parties.'"[179] Here, the allegedly fraudulent statement that "the deal was done" was made in the context of negotiations surrounding all three prospective contracts.[180] The alleged misrepresentation that Healthcare would shortly execute the Side Letter and Second Note Extension did not relate to the License Agreement.[181] Because the Counterclaim does not contain facts showing that any duty to carry out the remaining agreements and consummate the partnership was bargained for in the License Agreement, CVB and Sky Bacon have plausibly

---

[174] *Id.* at ¶ 136.

[175] *Id.* at ¶¶ 203–09.

[176] MTD 15–17.

[177] *Chinitz v. Ally Bank*, No. 2:19-CV-00059, 2020 WL 1692817, at *7 (D. Utah Apr. 7, 2020) (quoting *HealthBanc*, 435 P.3d at 196).

[178] MTD 16.

[179] *Vincent T. Taylor & Assocs., Inc. v. Mgmt. & Training Corp.*, No. 2:22-CV-527-TC, 2023 WL 6377600, at *4 (D. Utah Sept. 29, 2023) (quoting *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 244 (Utah 2009)).

[180] Counterclaim ¶¶ 125–27.

[181] *Id.* at ¶ 136.

pled a duty independent of the parties' contractual obligations. Furthermore, the validity of the License Agreement is disputed.[182] When parties dispute the existence or validity of a contract, courts have allowed breach of contract claims and tort-based fraud claims to proceed in the alternative because, if it is ultimately determined that no contract exists, "the economic loss rule may not apply."[183] The economic loss rule does not bar CVB and Sky Bacon's fraudulent misrepresentation claims.

### 2.    Presently Existing Fact

Healthcare next argues that the alleged misrepresentations relate to a promise of future performance rather than a presently existing fact and that the Counterclaim does not identify any facts showing that the Healthcare Companies intended to renege on the promise when it was made.[184] In Utah, a "promise of future performance can sustain a claim of fraud when 'at the time of the representation, the party making the representation did not intend to perform the promise and made the representation for the purpose of deceiving the promisee.'"[185] To base a fraud claim on such a promise, a plaintiff must allege sufficient facts to suggest the defendant knew the "representations of future performance were false" when they were made.[186] While the circumstances of fraud must be plead with particularity, intent and knowledge only need to be pled generally.[187]

---

[182] *Id.* at ¶¶ 137, 149–50; *see also* MTD 8–10.

[183] *Knight Brother, LLC v. Barer Eng'g Co.*, 2011 U.S. Dist. LEXIS 6585, *19.

[184] MTD 15; Reply to CVB/MPI 6–7.

[185] *Webster v. JP Morgan Chase Bank, NA*, 2012 UT App 321, ¶ 17, 290 P.3d 930, 936 (quoting *Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1047 (Utah Ct. App. 1994)).

[186] *Id.*

[187] *Unified Container, LLC v. Mazuma Cap. Corp.*, 280 F.R.D. 632, 636 (D. Utah 2012); Fed. R. Civ. P. 9(b).

Healthcare contends that the Counterclaim contains no facts showing that Healthcare intended not to perform when it made the alleged representations.[188] It points out that it signed both versions of the License Agreement,[189] which Healthcare considers evidence that it did intend to perform.[190] However, the Counterclaim also alleges that the Healthcare Companies knew the statements were false when they were made and intended for CVB to rely on the statements in allowing Healthcare and Mlily to access confidential information.[191] These allegations are supported by facts showing that the Healthcare Companies asked to accompany the Malouf Companies to meetings with CVB business partners within a week of making the representations.[192] Shortly thereafter, the parties met, and CVB disclosed significant amounts of confidential information.[193] After receiving the confidential information, the Healthcare Companies abruptly left, repudiating the License Agreement and refusing to execute the others.[194] Healthcare never signed the Second Note Extension or Side Letter despite promising to do so.[195]

At this stage, the court does not determine the merits of Plaintiffs' claims or weigh allegedly conflicting evidence.[196] It does not matter that some allegations in the Counterclaim—like those set forth by Healthcare—may weigh against finding intent so long as the Counterclaim contains sufficient factual allegations to make it plausible that Healthcare intended not to follow

---

[188] Reply to CVB/MPI 6–7.
[189] Counterclaim ¶¶ 136–37.
[190] Reply to CVB/MPI 7.
[191] Counterclaim ¶¶ 205–06.
[192] *Id.* at ¶¶ 139–41.
[193] *Id.* at ¶ 144.
[194] *Id.* at ¶¶ 146–50.
[195] *Id.* at ¶¶ 136–37, 149.
[196] *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1291 (10th Cir. 2023).

through on its promises when they were made. Accepting the well-pleaded facts above as true, the Counterclaim sufficiently alleges the Healthcare Companies' fraudulent intent.

### 3. Particularity

Healthcare also argues that the Malouf Companies do not state a claim for fraudulent misrepresentation because the consequences of the allegedly fraudulent conduct are not set forth with particularity as required by Rule 9(b).[197] CVB responds that it "experienced costly inventory shortages and shipping delays and lost customers due to Healthcare and Mlily's use of CVB's confidential and proprietary data."[198] Sky Bacon adds that it was forced into a "less favorable license deal" after Healthcare's repudiation of the License Agreement.[199] However, these alleged damages are either not linked to the misrepresentations at issue or are not pled with particularity.

CVB and Sky Bacon's fraud claim is based on the Healthcare Companies' alleged misrepresentations regarding the existence of a "strategic partnership" encompassing the License Agreement, the Second Note Extension, and the Side Letter.[200] CVB's claims of inventory shortages and shipping delays seem to be related to other alleged misrepresentations about Healthcare's willingness and ability to fulfill Lucid product orders.[201] Those additional misrepresentations are not referenced in the Count 5 fraud claim[202] and lack sufficient

---

[197] Reply to CVB/MPI 7; *see Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997).
[198] CVB/MPI Opp'n 13.
[199] Sky Bacon Opp'n 15–16.
[200] Counterclaim ¶¶ 203–04.
[201] *Id.* at ¶¶ 156–61; *see* CVB/MPI Opp'n 14 (citing to Counterclaim ¶¶ 156–63 for its claims of inventory shortage and shipping delay).
[202] *Id.* at ¶¶ 202–09.

particularity to support a fraud claim in any case.[203] CVB's argument related to lost customers is not reflected in the Counterclaim, which only states facts alleging that CVB revealed confidential information to the Healthcare Companies[204] and that "upon information and belief" the Healthcare Companies later used the confidential information "to CVB's detriment and for their unfair competitive advantage."[205] Allegations of the consequences and circumstances of fraud "based on information and belief usually do not satisfy the particularity requirement of Rule 9(b), unless accompanied by a statement of the facts upon which the pleader's belief is founded."[206] Here, the support for CVB's allegations comes from a single paragraph stating that "CVB has identified Healthcare's implementation of confidential CVB strategies shared in confidence."[207] This statement does not elaborate about how, when, or by whom these strategies were implemented or identified or even what the strategies were. The consequences and damages of CVB's reliance of the allegedly fraudulent statements have not been pled with sufficient particularity.

Similarly, Sky Bacon alleges that it lost out on the favorable terms of the License Agreement and was forced to enter an alternative, less-valuable agreement.[208] However, the Counterclaim states that this was the result of Healthcare's repudiation of the License Agreement rather than any reliance on Healthcare's assertions that the broader strategic partnership "was

---

[203] *See Schwartz v. Celestial Seasonings, Inc*., 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir.1991)) (Fraud claims must state "time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof").
[204] Counterclaim ¶ 144.
[205] *Id.* at ¶¶ 164–65.
[206] *SMHG Phase I LLC v. Eisenberg*, No. 122CV00035DBBJCB, 2023 WL 3821132, at *3 (D. Utah June 6, 2023) (cleaned up).
[207] Counterclaim ¶ 165.
[208] *Id*. at ¶ 155.

done" and that Healthcare would execute the Side Letter and Second Note Extension.[209] The Counterclaim pleads no facts to show that Healthcare's alleged fraud, rather than its breach of contract, caused Sky Bacon to settle for a less lucrative deal than the License Agreement. Sky Bacon has also not pled the consequences of the Healthcare Companies' alleged misrepresentations with sufficient particularity.

### B.    Warehouse Agreement Misrepresentations (Count 6)

MPI alleges that Healthcare and Mr. Ni made false representations that the parties' deal to rent the Ohio warehouse was "done" and that as a result MPI emptied the warehouse at great expense.[210] Healthcare argues that MPI has failed to state a claim because the Counterclaim does not allege a misrepresentation of a presently existing fact, support that MPI's reliance was reasonable, or describe the fraudulent misrepresentations with particularity.[211]

#### 1.    Particularity

MPI bases its fraudulent misrepresentation claim on Mr. Ni's alleged statements that "the deal was done" and his instruction to "clear out the warehouse."[212] The Counterclaim does not say exactly when these assertions were made, but it places them sometime in early 2024, prior to April.[213] The Counterclaim provides no facts about where or by what method these statements were communicated to MPI. The Tenth Circuit has held that "[a]t a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud, and must set

---

[209] *Id.*
[210] *Id.* at ¶¶ 211–14.
[211] MTD 15–18.
[212] Counterclaim ¶ 119.
[213] *Id.* at ¶¶ 112, 114, 119–21.

forth the time, place, and contents of the false representation."[214] It is unlikely that narrowing the timeframe of the statement to a range of several months is sufficiently precise.[215] Furthermore, the Counterclaim provides no facts to support the "where" of the statement.[216] MPI's fraud claim is not pled with sufficient particularity under Rule 9(b).

### 2.    Presently Existing Fact and Reliance

Given the Counterclaim's failure to describe the allegedly false representation with sufficient particularity, it is unnecessary for the court to decide whether the Counterclaim adequately alleged reasonable reliance and a false statement of presently existing fact.

## V.    Promissory Estoppel (Counts 8 and 9)

The Counterclaim asserts two counts of promissory estoppel, one based on Healthcare's alleged promise to "satisfy all CVB's Lucid product needs"[217] and one based on the alleged warehouse agreement with MPI.[218] Promissory estoppel requires "(1) a promise reasonably expected to induce reliance; (2) reasonable reliance inducing action or forbearance on the part of the promisee or a third person; and (3) detriment to the promisee or third person."[219] Here, the Healthcare Companies argue that CVB and MPI's promissory estoppel claims fail because they

---

[214] *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726–27 (10th Cir. 2006), abrogated on other grounds by *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 139 S. Ct. 1507, 203 L. Ed. 2d 791 (2019) (internal citations removed).

[215] *See Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1237 (10th Cir. 2000) (A complaint's assertion that the alleged misrepresentations were "made during 1982" did not "alert the Defendants to a sufficiently precise time frame to satisfy Rule 9(b)").

[216] MPI argues that the location of the warehouse (Ohio) satisfies the "where" requirement. CVB/MPI Opp'n 15. But Rule 9(b) requires particularity with respect to the allegedly false statement itself, not the location of the subject matter of the parties' broader dispute. *See Schwartz v. Celestial Seasonings, Inc*., 124 F.3d 1246, 1252 (10th Cir. 1997).

[217] Counterclaim ¶¶ 223–31.

[218] *Id*. at ¶¶ 232–38.

[219] *Cottonwood Imp. Dist. v. Qwest Corp*., ¶ 3, 296 P.3d 754, 755 (quoting *Weese v. Davis County Comm'n*, 834 P.2d 1, 4 n.17 (Utah 1992)).

are vague, lack reasonable reliance, and are barred by the statute of frauds.[220] To the last argument, CVB and MPI respond that their respective claims fall under exceptions to the statute of frauds.[221]

The Utah statute of frauds provides that some agreements, including a contract "for the leasing for a longer period than one year . . . of any lands, or any interest in lands"[222] or a "contract for the sale of goods for the price of $500 or more" are unenforceable unless they are written and signed.[223] Though the statute of frauds is an affirmative defense, it may be "raised in a motion to dismiss under Fed. R. Civ. P. 12(b)(6)" if the facts establishing that it applies are "clear from the face of the complaint."[224] A party may establish a "promissory estoppel exception to the statute of frauds" when a promisor's conduct "so clearly manifest[s] an intention that he will not assert the statute that to permit him to do so would be to work a fraud upon the other party."[225] However, this "fraud necessary to establish promissory estoppel, generally, cannot be predicated upon the mere failure to perform a promise or contract which is unenforceable under the statute of frauds."[226]

### A. Lucid Requirements Promise (Count 8)

The first promissory estoppel claim alleges that CVB reasonably relied on Healthcare's promise that it would fulfill all Lucid orders.[227] When Healthcare later refused to supply CVB's

---

[220] MTD 18–20.
[221] *See* CVB/MPI Opp'n 17–19.
[222] Utah Code Ann. § 25-5-3.
[223] Utah Code Ann. § 70A-2-201(1).
[224] *Nielson v. Daihen, Inc.*, No. 2:24-CV-00496-TS-DBP, 2025 WL 370498, at *3 (D. Utah Feb. 3, 2025).
[225] *Fericks v. Lucy Ann Soffe Tr.*, 2004 UT 85, ¶ 14, 100 P.3d 1200, 1204 (citing *McKinnon v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 529 P.2d 434, 437 (Utah 1974)).
[226] *Id.*
[227] Counterclaim ¶¶ 156, 224–25.

Lucid brand requirements, CVB was left without sufficient product for several months and experienced lost profits of over $40,000,000.[228] That Healthcare's commitment to "fulfill [CVB's] Lucid product needs"[229] would constitute a "contract for the sale of goods for the price of $500 or more"[230] is clear from the face of the Counterclaim. CVB contends that its claim is not barred by the statute of frauds because an exception applies; the Lucid products were to be specially manufactured for CVB.[231]

Under Section 201(3)(a), a contract for goods over $500 that is not in writing is still enforceable if (1) "the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business" and (2) "the seller . . . has made either a substantial beginning of their manufacture or commitments for their procurement."[232] Although the Lucid goods were to be specially manufactured for CVB, the Counterclaim pleads no facts suggesting that any such goods were not suitable for sale to others or that Healthcare had begun to manufacture or procure the Lucid products. To the contrary, the Counterclaim specifically alleges that the Healthcare Companies never intended to follow through on their License Agreement promises and intentionally reneged on the requirements agreement with the purpose of run[ning] CVB out of inventory."[233] CVB's claim for promissory estoppel is barred by the statute of frauds.

---

[228] *Id*. at ¶¶ 158–63.
[229] *Id*. at ¶ 157.
[230] Utah Code Ann. § 70A-2-201(1).
[231] CVB/MPI Opp'n 18.
[232] Utah Code Ann. § 70A-2-201(3).
[233] Counterclaim ¶¶ 162, 205–06.

### B.  Warehouse Promise (Count 9)

The second promissory estoppel claim alleges that MPI reasonably relied on Healthcare's promise to lease the Ohio warehouse from MPI for a period of five years.[234] This claim likewise falls under the statute of frauds, which requires leases of property for longer than one year to be written and signed.[235] MPI again argues that an exception applies, citing its expenditures in clearing out the warehouse as evidence of partial performance of the lease agreement.[236] The doctrine of part performance is a "firmly established" exception to the statute of frauds for land contracts.[237] However, it is "equally well established that the doctrine is purely equitable in nature, and . . . is not available to a plaintiff who brings an action at law for money damages on an oral agreement."[238] Simply put, the partial performance exception to the statute of frauds is only available in oral land agreements to compel specific performance,[239] not to claim monetary damages.[240] Because MPI seeks damages for Healthcare's breach of the oral lease agreement,[241] the partial performance exception does not apply, and the statute of frauds bars the promissory estoppel claim.

Both CVB and MPI's promissory estoppel claims are barred under the statute of frauds, so there is no need for the court to also determine if the promises underlying those claims were impermissibly vague or whether any reliance on the alleged promises was reasonable.

---

[234] *Id.* at ¶¶ 116, 233–35.
[235] Utah Code Ann. § 25-5-3.
[236] CVB/MPI Opp'n 19.
[237] *Baugh v. Darley*, 112 Utah 1, 5, 184 P.2d 335, 337 (1947).
[238] *Id*.
[239] Utah Code Ann. § 25-5-8.
[240] *McKinnon v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 529 P.2d 434, 436 (Utah 1974) ("The doctrine of part performance is not available in an action at law for monetary damages for breach of an oral contract to convey land.").
[241] Counterclaim 46(j).

## VI.    Trademark and Trade Dress Infringement (Count 10)

CVB and Sky Bacon next assert a claim for trademark infringement and trade dress infringement against the Healthcare Companies.[242]

### A.    Trade Dress

Healthcare first takes issue with the breadth of the tenth cause of action, which describes the claim as "trademark infringement" yet includes allegations of trade dress infringement as well.[243] Trade dress refers to a product's "total image and overall appearance."[244] A plaintiff may obtain relief for a trade dress infringement by showing that "(1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) [t]here is a likelihood of confusion among consumers as to the source of the competing products; and (3) [t]he trade dress is nonfunctional."[245] Both trade dress and trademarks are eligible for protection under the Lantham Act.[246]

Healthcare argues that including trade dress allegations in the same cause of action as trademark allegations creates a conflicting and conclusory claim that should be dismissed.[247] Healthcare cites to cases noting that the court need not "stitch together cognizable claims for relief from [a] wholly deficient pleading"[248] and that a plaintiff may not raise a general issue without alleging facts to support it because defendants must get fair notice of the claims against

---

[242] *Id.* at ¶¶ 239–47.

[243] Counterclaim at 41; MTD 21.

[244] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1146 (10th Cir. 2016) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n.1 (1992)).

[245] *Id.* (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1227 (10th Cir.2007)).

[246] *See Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1271 (10th Cir. 1988) ("A product's trade dress is eligible for protection under section 43(a) if it is so distinctive as to become, in effect, an unregistered trademark.").

[247] MTD 21.

[248] *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007).

them.[249] But the factual backgrounds of those cases are vastly different than the facts at issue here.[250] Although Count 10 does not include trade dress in its title, it explicitly alleges that the Healthcare Companies infringed on the Malouf Companies' trade dress,[251] intentionally marketed infringing versions of the trade dress,[252] caused consumer confusion due to trade dress infringements,[253] and violated the Lantham Act by their trade dress infringement.[254] These allegations are supported by factual assertions, like side-by-side photos of the trade dress and an allegedly infringing product and descriptions of the visual features that were copied.[255] The Counterclaim's express inclusion of trade dress allegations and supporting facts gives the Healthcare Companies sufficient notice of the trade dress infringement.[256] This is especially true given that trademark and trade dress protection arise from the same statutory scheme and have similar elements.[257]

### B.    Trademark

Healthcare also contends that the trademark infringement claim should be dismissed because the Malouf Companies failed to allege facts supporting an essential element.[258] "To adequately state a claim for trademark infringement under the Lanham Act, a plaintiff must

---

[249] *Simantob v. Mullican Flooring*, L.P., 527 F. App'x 799, 807 (10th Cir. 2013); *see* Reply to Sky Bacon 9.
[250] *Mann* was decided in the context of a complaint that contained a single 83-page "claim for relief" that never "identifie[d] a concrete legal theory nor target[ed] a particular defendant." 477 F.3d at 1148. In *Simantob*, the plaintiff raised a claim at summary judgment that was neither alleged in the complaint nor supported by any facts. 527 F. App'x at 807–08.
[251] Counterclaim ¶ 240.
[252] *Id.* at ¶ 244.
[253] *Id.* at ¶ 245.
[254] *Id.* at ¶ 246.
[255] *Id.* at ¶¶ 72–73.
[256] *See Someecards v. SnarkeCards, LLC*, No. 3:14-CV-00097-FDW, 2014 WL 3866024, at *2 (W.D.N.C. Aug. 6, 2014) ("At the pleadings stage, pictures of trade dress alone may provide the necessary description of trade dress.").
[257] *See Bimbo Bakeries USA, Inc. v. Sycamore*, 29 F.4th 630, 638 (10th Cir. 2022) (quoting *Forney Indus., Inc. v. Daco of Mo., Inc.*, 835 F.3d 1238, 1244 (10th Cir. 2016)) ("The Lanham Act protects "not just word marks . . . and symbol marks, . . . but also 'trade dress.'").
[258] MTD 21.

allege that it (1) owns a valid, protectable trademark; (2) the defendant used the trademark in commerce without the plaintiff's consent; and (3) the defendant's use of the trademark creates a likelihood of confusion."[259] Healthcare challenges the adequacy of the pleadings with regard to the third element, likelihood of confusion.[260] In the Tenth Circuit, courts look to six factors to evaluate the likelihood of confusion:

> (a) the degree of similarity between the marks; (b) the intent of the alleged infringer in adopting its mark; (c) evidence of actual confusion; (d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties; (e) the degree of care likely to be exercised by purchasers; and (f) the strength or weakness of the marks.[261]

Healthcare points out that the "the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks"[262] and asserts that the Counterclaim never alleges that any consumers were actually confused.[263] However, likelihood of confusion is a question of fact, which generally is not determined at the motion to dismiss stage.[264] A complaint need not conclusively prove that consumers were confused, only "allege some facts, that taken as a whole, are likely to cause consumer confusion" in light of the six factors.[265]

CVB and Sky Bacon point to several facts that correspond with confusion factors. The Counterclaim alleges that Healthcare has announced a pillow called the "BodiDough," which fully includes Sky Bacon's registered pillow trademark "Dough" in its name.[266] This implicates

---

[259] *Germann v. CMMG, Inc.*, No. 2:21-CV-583-DAK-CMR, 2022 WL 823935, at *2 (D. Utah Mar. 18, 2022).
[260] MTD 21.
[261] *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833 (10th Cir. 2005) (citing *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999)).
[262] *Id.* at 833.
[263] MTD 22.
[264] *Alfwear, Inc. v. Kulkote, LLC*, No. 2:19-CV-00027-CW-JCB, 2020 WL 4001242, at *3 (D. Utah July 15, 2020).
[265] *Id*.
[266] Counterclaim ¶¶ 79–80.

the degree of similarity between the marks.[267] The Counterclaim also alleges that Healthcare previously manufactured "Dough" pillows for the Malouf Companies and was therefore aware of the mark and its connection to pillows.[268] This goes to Healthcare's intent, "which turns on whether the alleged infringer adopted its mark for the purpose of deriving benefit from a plaintiff's existing mark."[269] Finally, the Counterclaim states that CVB has been selling "Dough" brand pillows since 2010.[270] A mark's strength is derived in part from the length and exclusivity of its use,[271] so facts showing over a decade of use of the "Dough" mark on pillow products supports a finding of strength. "[T]he presence of most or all factors is not necessary to establish likelihood of confusion,"[272] so the Counterclaim here sufficiently states a claim for trademark infringement when it pleads facts to plausibly support three of the factors related to likelihood of consumer confusion.

## VII.    Breach of Implied Warranty of Merchantability (Count 11)

Healthcare also challenges CVB's claim for breach of the implied warranty of merchantability.[273] CVB bases its claim on the defective products it was supplied by Healthcare and the Manufacturing Defendants.[274] Under the Utah Uniform Commercial Code ("Utah UCC"), if a buyer accepts defective goods, that buyer is "barred from any remedy" unless he notifies the seller of a breach "within a reasonable time after he discovers or should have

---

[267] *See Bedrock Quartz Surfaces, LLC v. Rock Tops Holdings LLC*, No. 2:23-CV-00310, 2023 WL 8481417, at *3 (D. Utah Dec. 7, 2023) ("This advertisement could plausibly cause confusion in consumers . . . since Rock Tops has used a term that is identical to Bedrock's name. In other words . . . the degree of similarity between the marks [] suggests that confusion is plausible.").

[268] Counterclaim ¶ 81.

[269] *M Welles & Assocs., Inc. v. Edwell, Inc.*, 69 F.4th 723, 733 (10th Cir. 2023).

[270] Counterclaim ¶ 80.

[271] *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1154 (10th Cir. 2013).

[272] *Alfwear, Inc. v. Kulkote, LLC*, No. 2:19-CV-00027-CW-JCB, 2020 WL 4001242, at *4 (D. Utah July 15, 2020).

[273] MTD 22–23.

[274] Counterclaim ¶¶ 248–254.

discovered" the breach.[275] If a plaintiff brings a claim for breach of implied warranty after accepting defective goods but does not allege that he gave notice to the defendant of the breach, the claim will be dismissed.[276] Healthcare contends that, because the Counterclaim contains no allegations that CVB ever gave the Healthcare Companies notice of the defective products, the breach of implied warranty claim fails.[277] In its Opposition, CVB responds that the notice requirement does not apply here because CVB, as a distributer, never accepted or inspected the defective goods.[278] Instead, the Counterclaim states that CVB is a distributer of bedding products[279] and that "retailers and end consumers" returned the defective products and made over 35,000 complaints.[280]

The Utah UCC only requires a buyer to notify a seller of an alleged breach after "tender has been accepted."[281] Acceptance of goods occurs when (1) a buyer signifies to the seller that he will retain the goods "after a reasonable opportunity to inspect" them, (2) a buyer fails to reject goods after having "a reasonable opportunity to inspect them," or (3) a buyer acts inconsistently with the seller's ownership.[282] The issue of whether a buyer "has had a reasonable opportunity to inspect, and thus whether an acceptance has occurred, is a question of fact."[283] Merely "[t]aking possession of the goods is not determinative of acceptance," and sufficient inspection must

---

[275] Utah Code Ann. § 70A-2-607(3)(a).
[276] *See Callegari v. Blendtec, Inc*., No. 2:18-CV-308-DB, 2018 WL 5808805, at *6 (D. Utah Nov. 6, 2018).
[277] MTD 22-23.
[278] CVB/MPI Opp'n 20.
[279] Counterclaim ¶ 19.
[280] *Id.* at ¶¶ 87, 92.
[281] Utah Code Ann. § 70A-2-607(3)(a).
[282] Utah Code Ann. § 70A-2-606(1).
[283] *Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp*., 1999 UT App 91, ¶ 12, 977 P.2d 541, 544; *see also Sjogren v. Maybrooks, Inc*., 214 Ill. App. 3d 888, 893, 573 N.E.2d 1367, 1369 (1991) ("[T]he question of reasonableness is particularly fact-sensitive. It follows that whether conduct has amounted to an acceptance or a rejection of goods is a question of fact to be determined within the framework of the facts of each particular case.").

generally "allow an opportunity to put the product to its intended use, or for testing to verify its capability to perform as intended."[284]

In this case, the Counterclaim does not clearly indicate that CVB ever had an opportunity to inspect the defective products, only stating that products were returned and that consumers complained or left negative reviews.[285] Because the Counterclaim does not clearly plead that CVB ever accepted the defective products, it does not give rise on its face to a duty to notify Healthcare under the UCC.[286] In the absence of facts showing clear acceptance, CVB's breach of implied warranty claim survives this stage of the proceedings.

## VIII.   Declaratory Judgment (Count 12)

MPI seeks a declaratory judgment that the parties reached a "meeting of the minds" as to the Second Note Extension and that the extension constitutes a valid, enforceable contract.[287] Healthcare opposes this request on the grounds that it does not allege facts independent of MPI's other claims and because an alleged injury has already occurred.[288]

First, "courts have determined that a declaratory judgment claim 'serves no useful purpose' where it raises issues that will necessarily be resolved in the context of other claims asserted in the same action."[289] For example, a claim for declaratory judgment that merely incorporates all other factual allegations in a complaint and requests a judgment "as to the rights

---

[284] *Colonial Pac. Leasing Corp.*, 977 P.2d at 545.
[285] Counterclaim ¶¶ 87, 92.
[286] Utah Code Ann. § 70A-2-607(3)(a).
[287] *Id.* at ¶¶ 255–63.
[288] MTD 23–24.
[289] *Acuity v. Kinsale Ins. Co.*, 750 F. Supp. 3d 1229, 1243 (D. Colo. 2024) (quoting *Golf Club, L.L.C. v. Am. Golf Corp.*, 2017 WL 1655259, at *2 (W.D. Okla. May 2, 2017)).

and liabilities of the parties to this [c]omplaint" is duplicative and should be dismissed.[290] In contrast, MPI's request relating to the Second Note Extension is not duplicated elsewhere in the Counterclaim. MPI asserts no breach of contract claims related to the Second Note Extension, instead seeking to assert that the agreement was valid and extended MPI's payment rights through August 2025.[291]

Second, "[t]he purpose of the Declaratory Judgment Act is to settle actual controversies before they ripen into violations of law or a breach of duty."[292] "Where [an] injury has already occurred and there is no threat of future harm, declaratory relief is inappropriate."[293] Here, MPI alleges that Healthcare repudiated the Second Note Extension.[294] Healthcare characterizes the repudiation as an injury that had already occurred and that forestalls the need for declaratory judgment.[295] However, because the Second Note Extension would provide MPI with additional payment rights that have not been raised in the Counterclaim, it is not apparent that there is no threat of future harm to MPI based on this contractual dispute.

## IX.    Group Pleading (Counts 4, 8, 10, and 11)

Finally, the Healthcare Companies move to dismiss several counts that fail to distinguish between the Manufacturer Defendants.[296] Rule 8 of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief."[297] This

---

[290] *Vanterpool v. Fed'n of Chiropractic Licensing Boards*, No. 22-CV-01208-CNS-NRN, 2022 WL 16635391, at *8 (D. Colo. Nov. 2, 2022).
[291] Counterclaim ¶¶ 255–63.
[292] *United States v. Fisher-Otis Co.*, 496 F.2d 1146, 1151 (10th Cir. 1974).
[293] *Shepherd v. U.S. Olympic Comm.*, 94 F. Supp. 2d 1136, 1149 (D. Colo. 2000).
[294] Counterclaim ¶¶ 260, 263(b).
[295] MTD 24.
[296] *Id*.
[297] Fed. R. Civ. P. 8(a)(2).

statement must "inform the defendants of the actual grounds of the claim against them"[298] by stating "what each defendant did to [the plaintiff]; when the defendant did it; [and] how the defendant's action harmed [the plaintiff]."[299] A complaint fails to satisfy this requirement when it brings claims against defendants as an "undifferentiated group" and states allegations that only make sense for certain defendants in that group.[300] For example, the Healthcare Companies rely on *Robbins v. Oklahoma*, where the court dismissed a claim that grouped all the defendants together even though their allegedly tortious conduct was "entirely different in character."[301] The facts alleged in the complaint similarly referred to "defendants" as a group in situations where it did not make sense to attribute the alleged conduct to many of the individual defendants.[302] By doing so, the complaint failed to provide the defendants with notice about what they had allegedly done, what harm they had caused, and how their individual actions caused that harm.[303]

That is not to say that a pleading must be dismissed "solely because it groups a number of actors together."[304] Instead, the court must determine "whether the pleading plausibly alleges that each given actor is liable for the misconduct alleged."[305] Group pleading may provide sufficient notice when the allegations against the defendants are not "entirely different in character," so there is little risk of "mistakenly grouping allegations against unrelated entities."[306] It is often

---

[298] *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008).
[299] *Nasious v. Two Unknown B.I.C.E. Agents, at Arapahoe Cnty. Just. Ctr.*, 492 F.3d 1158, 1163 (10th Cir. 2007).
[300] *Snyder v. ACORD Corp.*, No. 1:14-CV-01736-JLK, 2016 WL 192270, at *3 (D. Colo. Jan. 15, 2016), aff'd, 684 F. App'x 710 (10th Cir. 2017).
[301] *Robbins*, 519 F.3d at 1250.
[302] *Id.*
[303] *Id.*
[304] *Walker v. Abbaszadeh*, No. 2:23-CV-00912-DBB-CMR, 2024 WL 3375539, at *4 (D. Utah July 11, 2024).
[305] *Id.*
[306] *Carrado v. Daimler AG*, No. 17-CV-3080-WJM-SKC, 2018 WL 4565562, at *4 (D. Colo. Sept. 24, 2018).

more reasonable to state common allegations when "multiple defendants act[] in concert" or when one defendant is a "wholly- or partially-owned subsidiary" of another.[307]

In this case, the Counterclaim refers to the Manufacturer Defendants as a group in many factual allegations and several causes of action.[308] However, unlike the mismatched claims in *Robbins*, the group pleadings here only combine allegations of the same character that make sense for all the Manufacturer Defendants. For example, Count 4 alleges that each manufacturer defendant supplied CVB with defective and delayed products yet distinguishes these acts from additional allegations of misrepresentation in the same count that are only asserted against Healthcare and Mr. Ni.[309] The Counterclaim also pleads facts alleging that each Manufacturer Defendant supplied some of the over 35,000 defective products received by CVB and failed to provide sufficient notice of shipping delays.[310] Count 11 incorporates these same factual allegations into a breach of warranty claim.[311] Count 10 relies on facts showing that Healthcare acted in concert with the Manufacturing Defendants to distribute infringing products.[312]

The Counterclaim alleges that the Healthcare Defendants are subsidiaries and associates of Healthcare and only groups them together for specific claims and factual allegations that reasonably apply to each individual defendant in the group.[313] Therefore, it satisfies Rule 8 and plausibly asserts that the Manufacturing Defendants are liable for the alleged misconduct.[314]

---

[307] *Id.*

[308] *See, e.g.*, Counterclaim ¶¶ 78, 86–87, 199, 224, 240, 250.

[309] *Id.* at ¶ 199.

[310] *Id.* at ¶¶ 87, 102.

[311] *Id.* at ¶ 253.

[312] *Id.* at ¶ 78.

[313] *Id.* at ¶ 1.

[314] Because Count 8 is already barred, there is no need to determine whether it improperly groups pleadings.

## ORDER

Defendants' Motion to Dismiss is hereby GRANTED as to counts 1, 5, 6, 8, 9 and

DENIED as to Counts 2, 3, 4, 7, 10, 11, and 12.


Signed October 2, 2025.

BY THE COURT

_____
David Barlow
United States District Judge